Thank you, Your Honor. May it please the Court, the first thing we should probably turn to is docket number 20. We have an unresolved motion to strike. We have a pair file from the agency below is 1,336 pages documentation. Here on appeal, the solicitor has tried to introduce 100 pages of new evidence that was not of record before the agency below. It does not appear anywhere in the electronic file. And so I've moved to strike that. Opposing counsel has opposed. So that's the first thing we should do is resolve whether we're going to grant or deny that motion to strike. Well, the opposition is predicated on the fact that the information was disclosed even if copies were not provided. Isn't that the argument on the other side? The opposition is premised on the idea that if an examiner after appeal to the board, if the examiner merely provides a citation to a reference, that that makes the reference of record. And there's a couple sort of problems that raises. One is if the examiner here, the examiner at the Board of Appeal, withdrew all of the existing rejections and then on appeal, after closing the record to new evidence, the examiner cited these new documents, that I could go on the Internet, for example, and find those new evidence to rebut this. Wait a moment, Mr. Paul. As I understand the regulations under 41.39, the examiner can enter a new ground of rejection relying on new evidence. And then you have two options. You can elect to reopen prosecution or to maintain the appeal. And in this case, you elected not to reopen prosecution, which would have allowed you to introduce additional evidence. Instead, you decided to maintain the appeal. That's correct, right? That is procedurally correct with a footnote that the regulation 41.39 allows the examiner to make a new grounds of rejection on the evidence that's already of record but does not allow the examiner to introduce new evidence into the record on appeal. But that's not correct. That's just not correct. The regulation specifically contemplates new evidence being relied on on appeal by the examiner. That's why you're given the option to reopen. And the MPEP specifically talks about relying on new prior art that wasn't relied on before. And the examiner is permitted to do that, but it allows you to reopen prosecution if you wish to. And the problem with me reopening prosecution is that if the office reopens prosecution, remember we had a delay between, we had perhaps two years of delay between the time the examiner made a final office action and closed the record and the time the examiner raised this newly raised evidence. That's roughly a two-year delay. If the office at the Board of Appeals says, we're sorry, we perhaps made a mistake here, we at the office will reopen prosecution, I get that two years of delay added on to my client's patent term. So I haven't really, my client hasn't really lost anything. We've got some delay in issuing the patent, but we haven't actually had any of our 20 years of patent term waived. On the other hand, if I reopen prosecution, the rule is you get your patent term extended if the office makes a mistake. You don't get it extended if the applicant makes a mistake. And so if I reopen prosecution, one could argue, well, Mr. Hole, that means that you admitted that you made a mistake. And so you don't get the two years of delay added onto your patent term. Yeah, but there's no argument in this case about whether the patent term was correctly calculated. Exactly. I believe, sir, that your question behind the question is, why didn't I just reopen prosecution? Well, it's not a question of why you didn't. You had the opportunity to do that. And under those, under the circumstances, the rules are clear that the examiner can rely on new prior art. And your choice then is to maintain the appeal or to reopen prosecution. You chose to maintain the appeal. Correct. So I don't understand how you can complain that he relied on new prior art. Because he's not allowed to introduce new evidence of record after closing prosecution. 37 CFR 41.33 says you can't, there actually is. 37 CFR 41.33 technically does allow new evidence after appeal, but only if the examiner finds that it resolves all of the rejections on appeal and allows the case to be allowed. So, counselor, I don't understand your argument. You were at a point where you had an option, you had a choice to make, and you're saying that you did not, you chose to not reopen the examination on the basis that you would lose out on your patent term. Is that correct? Exactly, sir. Thank you. Judge Dye, can we take this under advisement? The motion to strike? Yes. Yes, that's what we should do. Okay. Okay, and then moving on to the merits, even assuming that Belmaceda, Ulisov, and all these prior art that was not a record during prosecution, even assuming that the court has jurisdiction to look at that, taking the board at its word, and this is something that I tried to sort of be kind of clear in my writing, is I haven't actually quoted Belmaceda or Ulisov. I've only quoted the board's hearsay description of Belmaceda and Ulisov. Taking the board at its word, neither Belmaceda nor Ulisov teaches a transgene. A transgene is, as the name trans means different, gene is, you know, something that expresses a protein. A transgene is a RN gene, a gene taken from one organism and put into a different organism. The board says that Belmaceda doesn't teach a transgene, but Ulisov does. Ulisov, however, according to the board, Ulisov teaches getting an adenovirus, taking the E1A gene out of the adenovirus, splicing a promoter onto it, and putting the E1A gene right back into the adenovirus right where you got it from in the first place. And so that is not a RN gene in the adenovirus, that's an adenovirus gene put right back in the adenoviral genome where it first came from. So the artisan would not consider Ulisov's E1A to be a transgene, they would consider it simply a gene. And we have a lot of the evidence which is of record, that was of record during the prosecution, shows that. In response, the office has called... Why isn't this within the broadest reasonable interpretation of transgene? I'm sorry again, Your Honor, could you repeat? Why is this prior art not within the broadest reasonable interpretation of transgene? Because the prior art teaches a gene, it does not teach a transgene, a foreign gene put into a foreign organism. Yeah, but you're not addressing the claim construction. The claim requires a transgene. It doesn't simply require a gene, it requires a transgene, a certain kind of a gene. A transgene, the artisan knows, the artisan understands the gene to be foreign. That's what the prefix trans means. So the examiner in interpreting the claim term transgene to simply mean gene, that it the prefix, and the artisan would not do that. This is Judge Rainer. Your time may have run out, but I'd like for you real quickly to answer the question regarding teaching away and why you feel that the board did not get that correct. I don't know why the board didn't agree with it. The Reinoff, Reinoff is a record. I made a record in an information disclosure statement. Reinoff has a very interesting article. He started out, he said, I'm going to see if there's any synergy between a... Let me get a little bit more specific with my question, Counselor. It seems to me that you're arguing that the board didn't dispute the points that you raised with respect to teaching away. Correct. So you're saying that the board's silence on this particular issue is there, that we should accept your argument on that basis? You could accept my argument on that basis, or if you want to be a little more thorough, you can actually read Reinoff, because it is a record, and Reinoff has, it has two parts. The first part is in vitro testing of cells, and Reinoff finds that in vitro, certain in vitro cell testing shows synergy, which would be, you know, a good, a reasonable expectation. But not in vivo. Exactly. And that's sort of the trick of Reinoff, is he did the in vitro, found there was synergy, then he did in vivo, and found that there was none. And so the, you know, these skilled arguments... Well, did he really find that there was none? Yeah, because he used the wrong kind of mice. The way that you get synergy here is to have an active immune system. It's actually not the chemotherapeutic that's killing the cancer cells, it's the patient's killer T-cells. And Reinoff used nude mice that don't have killer T-cells. So he used, he didn't realize that the immune system was important to get synergy, so he used the wrong kind of mice, and so... Is synergy even a limitation in the claim?  Is synergy even required by the claim? Synergy is not required by the claims, but synergy would be required for having an artisan read Reinoff and get a reasonable expectation of success to use that combination in humans. Yeah, except that the cases are very clear that the reasonable expectation of success is only addressed to claim limitations. So if synergy is not a claim limitation, as you admit, then it's not part of the reasonable expectation of success. Well, a claim limitation that is in there is human, and that, of course, is in vivo, and so we do need to have a reasonable expectation of success for humans. Are you contending that you always have to have in vivo testing before you could have  in vivo? Frankly, it's even worse than that. The field of cancer research, we are banging our heads against the wall with mouse models that don't accurately reflect what goes on in a human. We spend all this money testing in mice, works fine in mice, we try it in people, it fails. And so even more to the point, in the real world, and I'm not sure that I'm talking legal concepts so much as what I see on a day-to-day basis in research laboratories and drug companies, is scientists are just very frustrated because we have animal models that don't really reflect human reality. Yeah, but there's no evidence about that that you put in the record, right? No, no, no. That's a different question, sir. The evidence we do have, however, says that for Raynaud, and specifically for this specific combination, says that Raynaud says this specific combination does not work in vivo. This is only concerns claim three, right? Because it's the only claim that talks about this combination therapy? Correct, sir. Yes. Okay. Any further questions? Okay. Thank you, Mr. Pohl. We'll give you two minutes for rebuttal. Ms. Nelson? Good morning, Your Honors. May it please the Court. I'll pick up first with the issue of the references not being of record. And let me just give a little background as to what happened here. The examiners did issue new grounds of rejections, as she is entitled to do, under Rule 41.39. And that is because the applicants introduced new evidence in the RPO brief. And so that provision is in there for that very reason, and that's exactly what happened here. In fact, there was a 131 declaration that was submitted to annotate one of the key references. And that is why the exam-that's at 1080 of the record. And that's why the examiner issued the new grounds. When the examiner issued the new grounds, at that point, the appellant had a choice. And as you've indicated, they had a choice to either reopen prosecution or to forge ahead with the appeal before the board. And that's a choice they made. And they did go forward with the board-at the board. And so they are limited, to some extent, in terms of what evidence they can present. But- Well, that was a lot of new evidence, though, that the examiner put in, was it not? It was new grounds of rejection. And that's-you know, in 2004, this rule came into place, 41.39, and the actual reason for that was that applicants oftentimes would-or not oftentimes, but sometimes-add new arguments or new evidence in their appeal brief. And then the examiner, you know, has no recourse to sort of address that. And at times, they weren't even addressing it. And the important point is, it gives-then it gives the choice back to the applicant. So in this case, there was a 131 declaration that was submitted. They swore behind one of the key references, which then basically undid the grounds of rejection at play. The examiner then introduced new grounds. And, of course, then the choice is for the applicant at that point. And so they chose to go forward with the board. They could have gone back to the examiner and done anything- Excuse me? This is Judge Reyna. Do you agree that, had they gone back to the examiner, that they would have been docked on their PTA? You know, I think the PTA-I don't know exactly the provisions. I don't have them-you know, I don't have them by heart. But I believe that if they prevail before the board, ultimately then they would get some of that time back for the time that they were waiting before the board. So I don't think that's exactly accurate. But in any event, these references were of record by, as the board said, HEDGI, which is the only case-the only reference that was challenged before the board. The board properly found that the examiner, by making a full citation to it, complying with Rule 104, that made that reference of record. And notably, U.S. patents published applications are not actually put into the file or provided to the applicant. They're still of record because they're part of the rejection. And to the extent that they didn't have access, which there's no indication that they didn't have access, there was a mechanism in the MPP for them to contact the examiner. The examiner could provide the reference and then And obviously, with respect to the other references, their argument is waived and fails for the very same reason. If there's no questions for that, I'll move on to the transgene issue. So with respect to the transgene, here what we have is a limitation that is not defined in the specification- Back to that. Counselor, let's go back, just real quickly, back to the other issue. Okay. The government's position with respect to patent term adjustment, where the entity is facing new grounds and a slew of new evidence, like they have in this case. And now we're being told that if they say, well, we're going to seek to reopen the exam in order to address everything, then that's going to have an adverse impact on the patent term because they're going to be viewed as having delayed the process. What's the government's position on that? If the government introduces new grounds and new evidence, why should that have an adverse impact on the patent term? It doesn't have an adverse impact on the patent term. The examiner made the rejection within the time period that's allowed, then the applicant has its time period to respond. And assuming they stay within their time period, there's going to be no effect on patent term at the end of the day. But more importantly here, it's about choices and about getting the record ready for appeal. And here we have a situation where evidence-in fact, the applicant themselves brought in new evidence in their appeal brief, and so it really wasn't a closed record at that point. So the examiner had needed to respond to that, and they did. And at that point, the applicant had a choice to continue with prosecution, to write a response to that rejection, and get the record ready for appeal. Typically things should be sealed up and closed before they go on appeal. And here what we had was some lingering issues that hadn't been resolved. And it was perfectly appropriate for the examiner to open, not close, open, I mean, to issue the new grounds in response to the new issues that were raised in the appeal brief. Counsel, can we turn to rejection number three? And Raynolf, as I see the board, the board addresses the question of teaching away, but never proceeds to say, even if it doesn't completely teach away, that it doesn't completely teach away, and it also provides a reasonable expectation of success from the combination. It's the latter part of the analysis that seems completely missing from the board's opinion. I mean, I understand what the board was saying here, and let me just pull to the relevant section. All it really says is that Raynolf says that the combination would justify further investigation. Right. Well, Raynolf says a number of things, but I can first just sort of briefly say what Raynolf teaches. And first, it does produce, it does show synergy in Table 1. Just one second. Before we go on to that, this only applies to Claim 3, because only Claim 3 is a combination therapy, right? I believe Claim 42 might as well. I know it's Rejection 3, but let me- It's Rejection 3. There's several counts. There's several. It's usually 8 and 42. No, but it's only Claim 3. It's only Claim 3 as a combination therapy. Yes, it's only Claim 3. You're correct. There were multiple claims in the rejection, but with respect to the combination, it only affects Claim 3. And what Raynolf does, it teaches several things. It teaches, first, in vitro, that there is synergy between the GCV and TMZ, and that's in Table 1. And then in vitro, it teaches, it looks at tumor size and tumor weight, and this is in Figures 2 and 3. And it shows that each of the treatments, TMZ alone, GCV, or the combination, all have an effect in reducing tumor size and tumor weight. It actually showed a statistically significant difference between TMZ and the combination. Well, that's interesting, but the board doesn't say any of that, does it? The board just basically went ahead and acknowledged what they had said, which is- And the key point that I think the appellants were making was that there was no significant difference disclosed between TMZ and the combination. And so the board's response to that was, yes, okay, so even if they haven't disclosed synergy in the combination as compared to TMZ, they still teach other benefits. And that's where they point to page 299 of the record, where Raynolf talks about other benefits, clinical implications of the combination, which include reduced toxicity towards the host and decreased impact of acquired drug resistance. So the board says even that that alone would direct one to pursue the combination. And notably, I mean, this isn't a case where it's criticizing or discouraging or otherwise discrediting use of the combination. In fact, the final paragraph does suggest-it summarizes the data and talks about the demonstration of synergy between the combination and talks about it as an enhanced therapeutic concept for future studies in human malignant glioma. It's really directing one of skill in the art to that combination. And as the panelists have indicated, the claims don't actually require synergy, and nor does the application actually disclose synergy. The only disclosure is on page 69 of the record. And there's one example which describes really in text. It talks about one group having the biggest decrease in tumor size and other group with the combination having the longest survival rate. There's no comparison to either of them alone-GCV or TMZ alone-and no numbers, no data. On the combination therapy in Claim 3, is it not the case that Rubinoff shows that the combination therapy in vivo is superior to the placebo? Yes, compared to the placebo, yes. If that's what you're-yeah. Okay. Are there further questions? No. Okay. And I'd be happy to address transgene if you have any issues on that. Do my colleagues have any transgene questions? No. Okay. Then I'm happy to see the remainder of my time. I ask that you affirm the board's decision. Thank you, Ms. Nelson. Mr. Paul, you have two minutes. In closing, the- Assuming that I could have reopened prosecution or not, assuming that the examiner could have reopened prosecution at the board, that's one issue. Another issue that this court has got to consider is 35 U.S.C. Section 144, which I believe is a-it defines the jurisdiction of this court. And so regardless of whether the examiner or I elect to reopen prosecution or not, I think the jurisdiction of this court is limited to the record before the Patent and Trademark Office. And I think everyone here agrees that the 100 pages of new evidence that opposing counsel has presented to this court do not appear in the record before the agency. Counselor, this is Judge Vaino. That may be true, but the examiner did give full scientific citation for each one of those references. And the way I see this, I think that that gave you a sufficient basis. That gave you notice as to what you seek to respond to the new objection. I don't know that-it seems to me that the ball was in your court. And you chose to not follow the regulations and even our case law in this regard. You didn't state the reasons and you didn't follow up. So- Not follow the regulations such as? I'm curious. Well, look at CFR 1.104D1. And I imagine I was going to respond to this in more detail. Okay. All right. If there are no further questions, then I'll rest. Okay. Hearing no further questions, thank you, Mr. Paul. Thank you, Ms. Nelson. The case is submitted. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.